UNITED STATES of America,
Plaintiff-Appellee,

v.

Phillip ALPERN, Paul Baker, John Mierlak and Aubra Peters,
Defendants-Appellants.

Nos. 76–1347, 76–1348, 76–1367 and 76–1368.

United States Court of Appeals, Seventh Circuit.

Argued Feb. 11, 1977.

Decided Oct. 26, 1977.

Anthony M. Rocco, Franklin Park, Ill., William T. Huyck, Chicago, Ill., William H. Kampenga, Oak Lawn, Ill., Zenon Forowycz, Carl T. Robinson, Chicago, Ill., William H. Kampenga, Oak Lawn, Ill., for defendants-appellants.

Samuel K. Skinner, U. S. Atty., Robert Walter Tarun, Asst. U. S. Atty., Chicago, Ill., for plaintiff-appellee.

Before FAIRCHILD, Chief Circuit Judge, and SPRECHER and BAUER, Circuit Judges.

BAUER, Circuit Judge.

Following a jury trial, defendants-appellants were convicted of conspiring to bomb a tavern engaged in interstate commerce and of various substantive offenses committed in the course of the conspiracy. They seek reversal of their convictions on several grounds. Mierlak, who was convicted of unlawful possession of an explosive device and of conspiracy, claims that the district court erred in refusing his requests for a bench trial and a severance. In addition, he claims that prejudicial remarks made by the Government during closing argument tainted his conviction, and that the evidence was insufficient as a matter of law to prove his participation in the conspiracy charged. Peters, who was convicted of conspiracy and a number of substantive counts, claims that the district court erred in admitting a co-conspirator's declaration into evidence and in refusing to grant a mistrial following improper comment on his failure to testify at trial. Baker and Alpern, who likewise were convicted of conspiracy and various substantive counts, join Peters's mistrial claim. In addition, Baker attacks the sufficiency of the evidence against him and complains that he was forced to exhibit an arm tattoo to the jury in the course of trial. We find no merit to any of the defendants' contentions and affirm their convictions for the reasons noted below.

## I.

We turn first to Mierlak's claim that the district court abused its discretion in denying his motion for a severance. In support of this claim Mierlak points to the fact that he was named in only two of the 13 counts charged by the Government, and that he was the only one of the five defendants without a prior criminal record. A former policeman, Mierlak fears that he was found guilty by association, particularly in view of the fact that the Government produced so little evidence against him. Moreover, he contends that the jury was prejudiced by a codefendant's efforts to orchestrate a witness's testimony in the course of trial and by testimony that the Government's principal witness feared for his life, presumably because of threats of retaliation made by certain defendants against him. On the whole, Mierlak says, he was denied a fair trial because of the district court's refusal to grant him a severance. We disagree.

It is well settled that a defendant is not entitled to severance simply because a separate trial would provide him with a better chance of acquittal. Rather, a severance is mandated only when a defendant otherwise will be denied a fair trial. That depends upon whether, in the circumstances of a particular case, it is within the jury's capacity to follow the court's limiting instructions to assess each defendant's guilt or innocence solely on the basis of the evidence admissible against him. *United States v. Papia*, 560 F.2d 827, 836 (7th Cir. 1977). Because the necessity for a separate trial depends so much on the peculiarities of particular cases, district judges are afforded wide discretion in ruling on motions for severance. Accordingly, their rulings will not be overturned on appeal unless there has been a clear abuse of discretion.

We find no such abuse of discretion in the case at bar. Though Mierlak's chances of acquittal were not improved by standing trial with his codefendants, his claim that he was denied a fair trial is wholly speculative. Indeed, the very fact that one of Mierlak's codefendants with a prior criminal record of his own was acquit-

ted suggests that the jury was quite capable of assessing each defendant's case solely on the basis of the evidence admitted against him, notwithstanding the impact of the events to which Mierlak points as supporting his claim of prejudice. We find no more reason to assume the jury violated its clear instructions to give separate consideration to each defendant here than we did in *United States v. Papia, supra* at 836–37.

Mierlak's assignment of error in the district court's refusal to grant him a bench trial rests upon the supposition that he could not obtain a fair trial from a jury infected by the prior criminal records and overwhelming evidence introduced against his codefendants. He acknowledges that, under Rule 23(a) of the Federal Rules of Criminal Procedure, he was not entitled to a bench trial over the Government's objection. Nevertheless, he points to *Singer v. United States*, 380 U.S. 24, 37–38, 85 S.Ct. 783, 13 L.Ed.2d 630 (1965), as acknowledging the possibility that, in an exceptional case, the defendant's reasons for wanting a bench trial may be so compelling as to entitle him to one even over the Government's objection. According to Mierlak, this case, like the case hypothesized in the *Singer* dicta, is one in which an impartial trial by jury was impossible because of passions and prejudices stirred by his codefendants' prior records and the evidence introduced against them at trial.

We do not agree. As we noted above, nothing of record exists that causes us to doubt the jury's ability to give Mierlak a fair trial. Mierlak was tried by the same jury that acquitted one of his codefendants of the same charge, and we refuse to assume that the jury was so inflamed by passion and prejudice as to be unable to separate the guilty from the innocent. In view of the Government's objection to Mierlak's request for a bench trial, we do not believe the district court erred in refusing Mierlak's request.

We turn next to the question of whether the evidence was insufficient as a matter of law to support the conviction. In

support of this claim Mierlak presents to us essentially the same arguments that he urged upon the jury in his closing statement. The jury found them unpersuasive, and we do likewise. Suffice it to say that, cognizant of our duty to scrutinize the sufficiency of the evidence linking Mierlak to the conspiracy charged, *United States v. Buschman*, 527 F.2d 1082, 1084–85 (7th Cir. 1976), we believe that, when the evidence is viewed in the light most favorable to the Government together with all reasonable inferences that may be drawn therefrom, *Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 86 L.Ed. 680 (1942), we must conclude that it was sufficient as a matter of law for a reasonable jury to have found beyond a reasonable doubt that Mierlak knew of the object of the conspiracy and agreed to aid, abet and facilitate its achievement. That is the essence of the crime of conspiracy, and the fact that Mierlak's actual contribution to the illegal undertaking was peripheral, relative to that of his codefendants, is of no aid to him here.

Finally, Mierlak contends that prejudicial comments made during the Government's closing argument to the jury denied him a fair trial. First, Mierlak points to the statement of the Assistant United States Attorney that "What this amounts to, I submit, is a fabricated defense." According to Mierlak, this comment amounted to an improper statement of personal opinion regarding the defendant's veracity and guilt. *Harris v. United States*, 131 U.S.App.D.C. 64, 402 F.2d 656 (1968). Next, Mierlak complains that the prosecutor suggested to the jury that one of the other defendants had talked to each of the witnesses in an attempt to manipulate their testimony. Additionally, he complains that the Government argued facts not in evidence by stating that Mierlak's prints were all over the tape of his conversation with a co-conspirator used against Mierlak at trial. Finally, Mierlak complains that the prosecutor made reference to his oath of office before the jury in an improper effort to bolster the credibility of his case and his final argument. Mierlak contends that the total effect of the prosecutor's improper final argument was so prejudicial that a new trial is required. We disagree.

■ As to Mierlak's complaint regarding the prosecution's reference to a "fabricated defense," we believe that the comment could not have prejudiced Mierlak, for the reference was clearly directed to another defendant. Viewed in its context, the remark did not constitute and could not have been construed by the jury as an expression of the prosecutor's personal opinion regarding Mierlak's veracity or credibility. Similarly, the prosecutor's oblique reference to another defendant's attempts to manipulate the testimony of various witnesses could not have prejudiced Mierlak for the simple reason that the remark was not directed at any of his actions. Thus, notwithstanding the possible impropriety of these remarks, they give us no cause to reverse Mierlak's conviction.

■ Unlike Mierlak, we find nothing objectionable in the prosecution's statement that Mierlak's fingerprints were all over the tape of his incriminating conversation with a government witness. To be sure, the statement was literally untrue, for Mierlak never had any contact with the actual tape of his conversation. The jury, however, could not have failed to recognize that the prosecutor's reference to Mierlak's fingerprints being on the tapes was simply a metaphor designed to counter Mierlak's closing argument, which stressed the fact that his fingerprints were never found on the explosive device that he allegedly provided his codefendants. All the prosecutor meant was that the incriminating admissions made by Mierlak were even more convincing evidence of his guilt than any fingerprints would have been. We believe it was apparent to the jury that the prosecutor's statement was simply a metaphor and not an invitation to convict Mierlak on the basis of facts not in evidence. Indeed, if that was not apparent from the context, it was made explicit when the prosecutor explained the meaning of his reference to the jury following Mierlak's objection. In any event, we are convinced that the prosecu-

tor's statement played no part in Mierlak's conviction.

■ Finally, with respect to the prosecutor's reference to his oath of office, we must agree with Mierlak that it was outside the bounds of proper argument. Indeed, were we convinced that the reference was unprovoked and calculated to secure tactical advantage by placing the weight and prestige of the prosecutor's office behind the Government's case, we would be inclined to view the comment as reversible error without attempting to assess the likelihood of the prejudice resulting therefrom. The record, however, makes clear that the prosecutor's reference came in response to attacks that had been made on his professional integrity. His statement that he had done nothing to violate his oath of office as an Assistant United States Attorney was prefaced by reference to remarks made in another defendant's closing argument that insinuated the prosecution had induced witnesses to fabricate testimony. Under the circumstances, the prosecutor's remarks must be viewed as an invited response. See, e. g., *United States v. Isaacs*, 493 F.2d 1124, 1166 (7th Cir. 1974), *cert. denied*, 417 U.S. 976, 94 S.Ct. 3183, 41 L.Ed.2d 1146 (1975). Accordingly, as we believe the possibility that Mierlak was prejudiced thereby is remote, we are not inclined to view the prosecutor's brief loss of professional objectivity as reversible error in the circumstances of this case. The court, after all, was quick to admonish the prosecutor for overstepping the bounds of proper argument without unduly emphasizing the significance of his comment. Moreover, the jury was instructed that none of the arguments of counsel were evidence, and that its verdict must be based solely on the evidence presented as to each defendant. The law presumes that the jury was able to follow these instructions, see *Opper v. United States*, 348 U.S. 84, 95–96, 75 S.Ct. 158, 99 L.Ed. 101 (1954), and we see no sound reason for assuming that the prosecutor's defense of his own integrity weighed heavily in the jury's assessment of the evidence presented against Mierlak.

## II.

We now turn to Peters's claims that the district court erred in admitting an extrajudicial statement of a codefendant and in refusing to grant a mistrial following remarks of Mierlak's counsel that Peters construes as a comment on his failure to testify.

■ Peters's evidentiary objection stems from the testimony of a government witness that Baker asked her for Peters's phone number, dialed the number, and asked a party addressed as "Pete" to come by and pick up some dynamite Baker was holding for the conspirators. Peters concedes that the testimony was admissible against Baker to establish his participation in the conspiracy, and that the district court properly instructed the jury not to consider the above testimony on the issue of whether Peters was a member of the conspiracy. Notwithstanding the above, Peters argues that the testimony should have been excluded altogether because it had only slight probative value against Baker and because the jury was likely to rely on the evidence to establish Peters's participation in the conspiracy despite the court's cautionary instructions not to do so. Thus, he takes the position that the evidence should have been excluded under Rule 403 of the Federal Rules of Evidence because its probative value against Baker was "substantially outweighed by the danger of unfair prejudice" to Peters.

We find none of the cases on which Peters relies persuasive. We are not faced here, as we were in *United States v. Guajardo-Melendez*, 401 F.2d 35 (7th Cir. 1958), with evidence of such low probative value against one conspirator that the possibility of prejudicial use of the evidence against another defendant called for its exclusion altogether. Here, the testimony Peters would have us exclude was highly probative not only of Baker's participation in the conspiracy, but also of his possession of unregistered destructive devices. Apart from Baker's admission, the Government's case against him rested largely upon circumstan-

tial evidence predicated on the testimony of a witness whose credibility was subjected to sharp attack at trial. Baker's admission was an integral part of the Government's case; it was the most convincing means by which the Government could corroborate its other evidence of Baker's participation in the conspiracy and his commission of the other offenses with which he was charged. We do not believe that the district court abused its wide discretion in determining that the probative value of the above testimony against Baker outweighed its potentially prejudicial effect on Peters. The court scrupulously instructed the jury not to rely on this evidence to establish Peters's participation in the conspiracy, and we do not believe that the jury misconstrued the court's subsequent *Allegretti* instruction as an invitation to disregard the previous instruction regarding the limited admissibility of the very evidence of which Peters now complains.

Peters's argument, in which Alpern and Baker join, concerning improper comment on their failure to testify, is more troubling. In his closing argument, Mierlak's counsel attempted to bolster his client's credibility by stating:

> "Now, the prosecutor, you heard him, he took John Mierlak—who was not afraid to take the stand, he was the only defendant who took the stand in this case, ladies and gentlemen, was John Mierlak, remember that; he wasn't afraid to be confronted by these prosecutors, he stood up on that stand for an hour and 20 minutes, or thereabouts—. . . ."

Peters and his codefendants objected to the above remarks and moved for a midtrial severance and a mistrial. Their motions were denied by the trial judge, who sharply admonished Mierlak's counsel not to refer further to the other defendants' failure to testify. Relying on *DeLuna v. United States*, 308 F.2d 140 (5th Cir. 1962), the defendants contend that counsel's remarks violated their Fifth Amendment privilege against self-incrimination, which protects them from adverse comment concerning their refusal to testify, even when such comment emanates from a codefendant's attorney rather than from the Government.

We find *DeLuna* distinguishable from the case at bar. To be sure, in that case the Fifth Circuit found it necessary to reverse DeLuna's conviction because of adverse comments made by counsel for a codefendant concerning DeLuna's failure to testify. Unlike the case at bar, however, the *DeLuna* defendants argued mutually inconsistent defenses to the jury, in that each attempted to convince the jury that the other was to blame for the crime charged. Because of the peculiar posture of the case, the court found reversal necessary, in large measure because "it seems unrealistic to think any instruction to the jury could undo the prejudicial effects of the reference to de Luna's silence." *Id.* at 154–55. Subsequently, the Fifth Circuit has limited *DeLuna* to its own facts, *i. e.*, to cases wherein the defendants rely on mutually inconsistent theories of defense. *United States v. Nakaladski*, 481 F.2d 289, 302 (5th Cir.), *cert. denied*, 414 U.S. 1064, 94 S.Ct. 570, 38 L.Ed.2d 469 (1973). Other Circuits have taken the same view of *DeLuna's* precedential value. *E. g. United States v. Hines*, 147 U.S.App.D.C. 249, 455 F.2d 1317, 1334–35, *cert. denied*, 406 U.S. 969, 92 S.Ct. 2427, 32 L.Ed.2d 669 (1972); *United States v. Shuford*, 454 F.2d 772, 779 (4th Cir. 1971). As the case at bar does not fit the *DeLuna* facts, we find it of little aid to the defendants who urge us to follow it here.

[12] Our own decision in *United States v. Hutul*, 416 F.2d 607, 621 (7th Cir. 1969), *cert. denied*, 396 U.S. 1012, 90 S.Ct. 573, 24 L.Ed.2d 504 (1972), is more closely in point. In that case Hutul's attorney remarked in closing argument: "I speak only for Mr. Hutul. He was the only one who testified in this case." We distinguished *DeLuna* in *Hutul* and held that counsel's comments created no reversible error. Here, as in *Hutul*, counsel's statement that his client was "the only defendant who took the stand" was but an isolated and oblique reference to his codefendants' failure to take the stand having no prejudicial effect that could not be cured by the cautionary in-

structions given in this case. We find *Hutul* controlling and hold that counsel's reference created no reversible error.

### III.

Finally, we turn to Baker's contentions that the Government failed to prove that he was a member of the conspiracy, and that the court erred in allowing the Government to force Baker to show an arm tattoo to the jury in the course of trial.

Baker's attack on the sufficiency of the Government's evidence focuses upon the circumstantial character of the evidence linking him to the conspiracy and the failure of the Government's principal witness to positively identify Baker as a participant in various meetings and conversations central to the conspiracy.

■ As the Government's brief concedes, if the circumstantial identification testimony that Baker attacks as woefully inconclusive were the only evidence produced linking Baker to the conspiracy, his challenge to the sufficiency of the evidence might have merit. Baker's brief, however, conveniently ignores a credible body of circumstantial and direct evidence linking him to the conspiracy, the most incriminating of which came from Baker's own mouth. Little purpose would be served by detailing the nature of the evidence and the reasonable inferences therefrom that the jury could have relied upon as establishing Baker's membership in the conspiracy charged. We are convinced that, viewed in the light most favorable to the Government, the evidence taken as a whole was more than sufficient to support the jury's finding that Baker was guilty beyond a reasonable doubt.

Baker next complains about the fact that the Government forced him to display his arm tattoo to the jury in an effort to convince the jury that Baker was in fact the driver of a car involved in the bombing charged by the Government. According to a government witness, the driver of the car had a distinctive greenish and reddish arm tattoo. Baker's objection to the Government's request that he display his arm tattoo to the jury rests on the ground that the request was untimely in that it was made at the close of the Government's case rather than at the time its witness testified about the driver's tattoo. The Government's failure to ask its witness to identify Baker's tattoo as the tattoo he observed on the driver of the car, says Baker, creates a presumption that the Government believed its witness could not identify Baker or his tattoo. Accordingly, by requesting Baker to exhibit his tattoo at the close of its case, the Government was inviting the jury to draw an inference that it knew was not founded upon the evidence.

■ There is no merit in Baker's contention. We are unaware of any requirement that the display of physical characteristics of a defendant to the jury for purposes of identification must take place at any particular time in the course of the trial. Neither of the cases on which Baker relies, *Schmerber v. California*, 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966), and *State v. Ah Cheuy*, 14 Nev. 79 (1897), stands for this proposition. Moreover, Baker's counsel himself could have requested on cross-examination that Baker display his tattoo to the witness. Are we then to assume that, because such a request was not made at that time, Baker must have believed that the witness could identify him or his tattoo? We think not. Neither will we assume that the Government's failure to make such a request on direct examination creates any presumption that the Government knew its witness could not have identified Baker's tattoo. In short, we think Baker's argument that he was prejudiced by the timing of the Government's request is frivolous.

### IV.

For the reasons noted above, the judgments of the district court are

Affirmed.